**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| LAURIE LYNN BROWN, *et al.*,<br><br>       Plaintiffs,<br><br>    v.<br><br>FEDERAL AVIATION<br>ADMINISTRATION, *et al.*,<br><br>       Defendants. |

Civil Action No. 23-2251 (CKK)

**MEMORANDUM OPINION**
(March 31, 2025)

This Federal Tort Claims Act case arises from a probate dispute over the ownership and operation of an Iowan family's crop-dusting business. Lacking subject-matter jurisdiction, the Court will **GRANT** Defendants' [14] Motion to Dismiss. Even if the Court had jurisdiction, Plaintiffs' Complaint is time-barred, fails to state a claim, and should have been brought in Iowa. Accordingly, the Court will **DISMISS** this matter with prejudice.[1]

## I. BACKGROUND

The dispute at the heart of this case began in 2016 with the death of Robert Pettis. *See* Compl. at 57.[2] Robert Pettis controlled Pettis Ag Aviation ("Pettis Ag"), a member-managed LLC and crop-dusting business in Atlantic, Iowa. *See id.* at 52, 63. Before Robert Pettis passed, Plaintiffs Laurie Brown and Kim Bally—who appear to be Robert Pettis's daughters—became members of the Pettis Ag LLC. *See id.* at 56. Dathan Pettis, Robert Pettis's grandson and Plaintiffs' nephew, worked at the family business alongside his grandfather. *See id.* at 63, 71.

---

[1] The Court's consideration of these issues focused on: Plaintiffs' Complaint, ECF No. 1 ("Compl."); the Memorandum in Support of Defendants' Motion to Dismiss, ECF No. 14-1 ("Mot."); Plaintiffs' Response, ECF No. 16 ("Resp."); and Defendants' Reply, ECF No. 20 ("Reply").

[2] The Court relays the facts as presented in the Complaint and *assumes*, but does express a view on, the truth of those allegations. Plaintiffs' Complaint includes a civil cover sheet, a one-page summary of their claim, forty pages of exhibits, and a brief "timeline." The Court cites to the page numbers in the pdf created by combining all attachments.

When Robert Pettis perished, a battle for succession of Pettis Ag ensued. Dathan Pettis "assumed the duties of Manager" of Pettis Ag in his grandfather's stead and began holding himself out as the owner of Pettis Ag. Compl. at 50, 53, 71. This did not sit well with Plaintiffs (who, again, were members of the Pettis Ag LLC) or Jerry Brown (Plaintiff Laurie Brown's husband, another member of the Pettis Ag LLC, and the executor of Robert Pettis's estate). *See id.* at 50, 56. The family dispute over control of Pettis Ag then spilled into the Iowa courts.

First, Plaintiffs' faction of the family, acting through Robert Pettis's estate, pursued an ejectment action against Dathan Pettis and the City of Atlantic, Iowa—which owned the hangars used by Pettis Ag and leased them to Robert Pettis. *See* Compl. at 56. In August 2017, applying Iowa tenancy law, the Cass County District Court ejected Dathan Pettis and ordered that Robert Pettis's estate assume possession of the hangars as a holdover tenant at will. *Id.* at 57–60.

Second, in a related suit, the two sides of the Pettis family fought for ownership of Pettis Ag and its most valuable assets, two sprayer airplanes. *See* Compl. at 52–54. Finding disputes of material fact as to the "genealogy of membership" of the Pettis Ag LLC, the Cass County District Court denied Dathan Pettis's motion for summary judgment in June 2017. *Id.* But in March 2018, just before the jury entered the courtroom for trial, the Pettis factions settled. *Id.* at 34.

Under the terms of that settlement, Dathan Pettis agreed to pay almost $200,000 to Plaintiffs and Robert Pettis's estate. Compl. at 34. In exchange, Dathan Pettis assumed the hangar lease and ownership of Pettis Ag and one sprayer plane. *Id.* at 34–35. Plaintiffs took ownership of the other plane and agreed not to operate a competing crop-dusting business in the area. *Id.* at 35–37. Plaintiffs also agreed to "immediately withdraw their complaint(s) filed against Dathan Pettis with any law enforcement agency, state or federal regulatory authority, or local community agency or representatives where they have previously made such a complaint." *Id.* at 36.

That final term addresses the kernel of Plaintiffs' suit in this Court. As the Pettis family feud wound its way through the Cass County District Court, Plaintiffs simultaneously pursued regulatory relief against Dathan Pettis from the Federal Aviation Administration (FAA) and Brian Lundquist, an Aviation Safety Inspector in the FAA's Iowa Field Office. *See* Compl. at 69.

The FAA regulates agricultural aircraft operations, like crop-dusting. *See* 14 C.F.R. § 137. Among other things, the FAA's regulations require agricultural aviators to obtain "an agricultural aircraft operator certificate," commonly known as a Part 137 Certificate. *Id.* § 137.11. To qualify for a Part 137 Certificate, an applicant must "have at least one certificated and airworthy aircraft equipped for agricultural operation." *Id.* § 137.19. An agricultural aviator may seek amendment of an existing Part 137 Certificate from the relevant Flight Standards field office. *Id.* § 137.17.

Before his death, Robert Pettis held a Part 137 Certificate as owner of Pettis Ag. *See* Compl. at 36. In March 2016, shortly after Robert Pettis's passing, Dathan Pettis requested that Pettis Ag's Part 137 Certificate be amended and listed himself as the owner of both Pettis Ag and Pettis Ag's two sprayer planes. *Id.* at 32. Lundquist, the relevant FAA functionary, received and approved Dathan Pettis's application. *Id.* at 28. Plaintiffs (who at the time disputed Dathan Pettis's ownership of Pettis Ag and the planes) allege that Lundquist did so negligently because he should have spoken with them before approving the amendment. *Id.*

Later in 2016, as the intra-family litigation was beginning in state court, Plaintiffs alerted Lundquist to Dathan Pettis's misdeeds. Compl. at 28. They also advised Lundquist that, although Dathan Pettis had improperly procured Pettis Ag's Part 137 Certificate, Dathan Pettis was in fact operating a new crop-dusting business—Pettis Aviation, LLC—without the appropriate licensure. *Id.* Despite Plaintiffs' warnings, Lundquist did nothing. *Id.* And Dathan Pettis, acting through Pettis Aviation, earned profits during the 2016 spraying season that were rightfully Pettis Ag's. *Id.*

In March 2017, Dathan Pettis submitted to Lundquist another request to amend the Part 137 Certificate, this time requesting that Pettis Aviation replace Pettis Ag on the Certificate. Compl. at 45–46. But the executor of Robert Pettis's estate—which at the time still controlled Pettis Ag—had terminated Dathan Pettis from Pettis Ag in January 2017. *Id.* at 71–72. The estate informed Lundquist and the FAA of this fact when it learned of Dathan Pettis's latest request for amendment. *Id.* at 28. And the FAA denied Dathan Pettis's request on that basis. *Id.* at 47.

In the aftermath, an FAA attorney advised that "Dathan Pettis did not have authority to obtain" Robert Pettis's Part 137 Certificate and recommended that the Certificate "be reverted back" to the estate and that the FAA "investigat[e] Dathan's fraud." Compl. at 49. Upon receiving direction that the Certificate would "have to be revised taking Dathan out of the picture," an FAA supervisor wrote to Lundquist: "Uh-oh." *Id.* at 48.

Two months later, in May 2017, Lundquist and his supervisor discussed their follow-up efforts. *See* Compl. at 50–51. Because public records in the Iowa Secretary of State's Office listed Dathan Pettis as holding a position in Pettis Ag, Lundquist concluded that the FAA "acted appropriately and followed the guidance" when amending the Part 137 Certificate in 2016. *Id.* at 50. And because the Pettis-family litigation over control of Pettis Ag was still ongoing, Lundquist concluded that it was unclear "who owns or who is in control of the [Pettis Ag] LLC." *Id.*

Faced with this uncertainty, Lundquist directed Dathan Pettis to surrender the Part 137 Certificate to the FAA and advised both Pettis factions to apply for new certificates independently. Compl. at 50–51. Lundquist's supervisor agreed this was the appropriate course "until we get some definitive legal guidance on who owns what" and approved what he described as "a we[-]don't[-]care approach." *Id.* at 50. Plaintiffs allege that Lundquist in fact knew who owned Pettis Ag (Plaintiffs) and "intentionally ignor[ed]" that fact to Plaintiffs' detriment. *Id.* at 28.

The FAA took no further action after that point.  *See* Compl. at 29.  And as a result, Plaintiffs lost out on still more profits from Pettis Ag during the 2017 spraying season.  *Id.*  Just before the 2018 spraying season, the Pettis family settled their suit, and Dathan Pettis took control of Pettis Ag.  *Id.*  But Plaintiffs "continued to question" the FAA about its earlier inaction and their lost profits in 2016 and 2017.  *Id.*

Eventually, in May 2021, the FAA sent Plaintiffs a letter regarding their concerns.  Compl. at 63.  That letter explained that because Dathan Pettis "registered with the state of Iowa as the Agent For Service of Pettis Ag Aviation LLC" when he applied to amend the Part 137 Certificate in March 2016, "[a]ll regulatory requirements to issue the certificate were found to be met at the time of certification."  *Id.*  The letter further advised that "[d]isputes regarding the assets of the Robert Pettis estate are not within the purview of the FAA."  *Id.* at 64.  And the letter concluded by noting that Plaintiffs' allegations of impropriety against Lundquist had been "referred to the FAA's Security and Hazardous Materials office (ASH) for investigation."  *Id.*  Plaintiffs provide no detail on the results or status of that investigation.

In July 2023, Plaintiffs, proceeding *pro se*, filed this suit under the Federal Tort Claims Act against Lundquist and the FAA.  Compl. at 3.  Plaintiffs' Complaint asserts that Lundquist was negligent in processing Dathan Pettis's 2016 application for amendment of the Part 137 Certificate and by later failing to correct his error.  *Id.* at 23.  Plaintiffs also assert, more vaguely, that Lundquist discriminated against them on the basis of gender.  *Id.* at 29.  On these grounds, Plaintiffs seek $9,450,000 in damages—a figure derived by adding the value of their lost "debt free respectful, legacy family business" to the salary "fraudulently collected" by Lundquist since 2016 and multiplying that sum by two (for the two Plaintiffs).  *Id.* at 4.

Defendants filed the instant Motion to Dismiss.  And that motion is ripe for review.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may seek dismissal of a complaint or claim for lack of subject-matter jurisdiction. Federal district courts are courts of limited jurisdiction, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). As a result, plaintiffs bear the burden of establishing subject-matter jurisdiction by a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In assessing a Rule 12(b)(1) motion, the Court accepts as true, the plaintiff's factual allegations and draws all reasonable inferences in the plaintiff's favor. *Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (KBJ).

Rule 12(b)(6) authorizes a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive such a motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A plausible claim allows the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court accepts the truth of the plaintiff's factual allegations and draws all reasonable inferences in the plaintiff's favor. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314–15 (D.C. Cir. 2014). But the Court does not accept the truth of "legal conclusions or [draw] inferences that are unsupported by the facts alleged." *Id.* at 315.

Under Rule 12(b)(3), a defendant may move for dismissal for improper venue. On such a motion, the Court accepts as true the plaintiff's factual allegations and draws all reasonable inferences from those allegations in the plaintiff's favor. *Pendelton v. Mukasey*, 552 F. Supp. 2d 14, 17 (D.D.C. 2008) (JDB). But the plaintiff bears the burden of establishing that venue is proper in this Court. *McCain v. Bank of Am.*, 13 F. Supp. 3d 45, 51 (D.D.C. 2014) (BAH).

The Court is mindful that Plaintiffs are proceeding without counsel. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). At the Rule 12(b) stage, the Court considers a *pro se* litigant's complaint in light of all filings, including those responsive to a motion to dismiss. *Brown v. Whole Foods Market Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015).

### III. ANALYSIS

Defendants request that the Court dismiss the Complaint with prejudice for four reasons. Mot. at 7. First, they argue the Court lacks subject-matter jurisdiction because Defendants enjoy sovereign immunity against this suit. *Id.* at 8–22. Second, they argue Plaintiffs' claims are untimely. *Id.* at 22–25. Third, they assert that venue is improper in this Court. *Id.* at 27–28. And fourth, they contend that the Complaint fails to state a claim. *Id.* at 25–27. The Court agrees on all fronts and takes each issue in turn.

#### A. Sovereign Immunity Bars Plaintiffs' FTCA Claim.

Sovereign immunity shields the United States and its officers and agencies from suit absent a waiver. *See Loeffler v. Frank*, 486 U.S. 549, 554 (1988). That sovereign immunity is jurisdictional in nature. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). And "the terms of [the United States's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Because each Defendant in this matter is protected by the aegis of the United States's sovereign immunity, the Court has subject-matter jurisdiction only if Plaintiffs' claims fall within the scope of a statutory waiver of that immunity.

The Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (FTCA), provides a limited waiver of the United States's sovereign immunity against damages liability for torts committed by federal

employees acting within the scope of their employment. 28 U.S.C. §§ 1346(b), 2674. But the FTCA reserves immunity against some types of tort claims through a number of enumerated exceptions. *See id.* §§ 2680(a)–(n). And the waiver of sovereign immunity does not apply at all unless "the United States, if a private person, would be liable to the claimant in accordance with the law of the place" where the tort allegedly occurred. *Id.* § 1346(b)(1).

Here, the Court lacks subject-matter jurisdiction over Plaintiffs' FTCA claim because the discretionary-function exception to the FTCA's waiver of sovereign immunity bars this suit and because Plaintiffs have not shown that Iowa law provides an analogous cause of action.

### 1. The Discretionary-Function Exception Applies.

Defendants are immune to Plaintiffs' FTCA claim under the discretionary-function exception. That exception preserves the United States's sovereign immunity against "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary-function exception applies when the challenged action or inaction is (1) "discretionary in nature" because it involves "an element of judgment or choice" and (2) "based on considerations of public policy." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (cleaned up). Both criteria are satisfied here.

The Court pauses briefly to clarify the function at issue. The Complaint makes clear that Plaintiffs' FTCA claim concerns Lundquist's allegedly negligent application of the FAA's Part 137 licensing regulations to Dathan Pettis's requests to amend Pettis Ag's Part 137 Certificate. *See* Compl. at 23. Likewise, Plaintiffs' Opposition lists "Challenged Acts" that all relate to the Part 137 Certificate. Opp'n at 10–13. [3] The Court will follow Plaintiffs' lead.

---

[3] Plaintiffs' Opposition is interrupted repeatedly by reproductions of the exhibits to the Complaint. Throughout, the Court cites to the Opposition using the page numbers on the bottom of the page, not the ECF-generated numbers.

*Discretionary in Nature.*   Administering the FAA's Part 137 licensing regulations is "discretionary in nature" because it involves an "an element of judgment or choice." *Gaubert*, 499 U.S. at 322.  On this point, *United States v. S.A. Empresa de Viacao Aerea Rio de Grandense (Varig Airlines)*, 467 U.S. 797 (1984) ("*Varig Airlines*"), is particularly instructive.

Like this case, *Varig Airlines* involved an FTCA challenge to the FAA's administration of licensing regulations.  467 U.S. at 814.  There, the plaintiffs argued the FAA was "negligent in issuing [an operational safety] certificate" because it "failed to inspect" certain elements of airplanes that would have revealed regulatory noncompliance.  *Id.*  The Court stressed that the statute authorizing the relevant certification process "empowered the [FAA] to establish and implement a mechanism for enforcing compliance" with Congress's general policy prescriptions. *Id.* at 816.  And noting that the discretionary-function exception "plainly was intended to encompass the discretionary acts of the Government acting in its role as regulator of the conduct of private individuals," the Court held that "the discretionary[-]function exception precludes a tort action based upon the conduct of the FAA in certificating" aircraft.  *Id.* at 813–14, 815–16.

That reasoning applies with equal force here. Like the statute in *Varig Airlines*, the statute authorizing the Part 137 regulations at issue here grants the FAA discretion in deciding whether and how to issue certificates for agricultural aircraft operations.  The FAA "may issue" such certificates.  49 U.S.C. § 44702(a).  The FAA "may delegate" the authority for such issuance to employees like Lundquist.  *Id.* § 44702(d)(1).  The FAA "may prescribe" regulations establishing the "examination, testing, and inspection necessary to issue a certificate."  *Id.*  And in administering those regulations, employees like Lundquist assume the FAA's "role as regulator of the conduct of private individuals" like Dathan Pettis.  *Varig Airlines*, 467 U.S. at 813–14.

It is clear that a function is not discretionary "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). And the Part 137 regulations do provide that an applicant "is entitled to" a Part 137 Certificate under certain specified conditions. 14 C.F.R. § 137.19. So, Plaintiffs might argue, Part 137 licensure is not discretionary because FAA employees like Lundquist are mandated to mechanically apply particular regulatory criteria: If the criteria are met, issue or amend a Certificate; if the criteria are not met, do not.

But the Part 137 regulations are not so simple. Rather, they embody the sort of "general directive that leaves implementation decisions in the hands of federal officials" that "does not qualify as a mandatory directive" under the first prong of the discretionary-function test. *Hsieh v. Consol. Eng'g Servs., Inc.*, 698 F. Supp. 2d 122, 133 (D.D.C. 2010) (CKK) (first quoting *Loughlin v. United States*, 286 F. Supp. 2d 1, 8 (D.D.C. 2003) (ESH)). For example, the FAA "grants a request to amend a certificate if it determines that safety in air commerce and the public interest so allow." 14 C.F.R. § 137.17. And the FAA issues Part 137 Certificates in the first instance based on a determination that the applicant "has satisfactory knowledge and skill regarding agricultural aircraft operations." *Id.* § 137.19(e). These criteria, among others, plainly afford individual regulators like Lundquist a degree of judgment or choice.

***Considerations of Public Policy.*** Likewise, the FAA's administration of the Part 137 regulations is "based on considerations of public policy." *Gaubert*, 499 U.S. at 323. Here, "the question is not whether a government agent actually weighed policy considerations in making a particular choice." *Donahue v. United States*, 870 F. Supp. 2d 97, 105 (D.D.C 2012) (PLF). Rather, "the test is satisfied if the *type of choice* at issue is susceptible to policy considerations." *Id.* (emphasis added). Whether to issue, amend, or revoke a Part 137 Certificate is such a choice.

Where, as here, "a regulation allows the employee discretion," the Supreme Court has recognized a "strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to promulgation of the regulations." *Gaubert*, 499 U.S. at 324. The FAA's regulatory authority originates from Congress's policy judgment that "an agency equipped with specialized knowledge would be best able" to flexibly respond to advancements in aviation technology "and to update minimum air safety standards accordingly." *Holbrook v. United States*, 673 F.3d 341, 346 (4th Cir. 2012). The FAA is empowered to "develop plans and policy" based on its view of "the public interest." 49 U.S.C. § 40103(b)(1). And the Part 137 regulations are a product of the FAA's mandate to develop policies to promote "the highest possible degree of safety in the public interest." *Id.* § 44702(b)(1)(A).

The Court can identify no basis to rebut the presumption that the discretionary certification function authorized by those regulations involves the same policy concerns. In fact, the regulation at the heart of this case empowers FAA regulators to amend Part 137 Certificates when "safety in air commerce and the public interest" favor amendment. 14 C.F.R. § 137.17. The Court struggles to imagine a clearer example of a regulatory function based on considerations of public policy.

Plaintiffs' only counterargument is that this analysis is irrelevant because "Lundquist made the conscious decision to do nothing" so "no discretionary decisions were made." Opp'n at 14. That cannot be reconciled with the Complaint, which takes issue with Lundquist's affirmative choice to amend the Part 137 Certificate in 2016. *See* Compl. at 23. But even if Plaintiffs sought relief only for Lundquist's alleged inaction, their argument would still fail. The United States is immune against suits premised on an alleged "*failure to* exercise or perform a discretionary function or duty." 28 U.S.C. § 2680(a) (emphasis added). In other words, the discretionary-function exception does not distinguish between sins of omission and commission.

Because Lundquist's and the FAA's administration of the Part 137 regulations satisfies both elements of the discretionary-function exception, sovereign immunity bars Plaintiffs' FTCA claim and the Court lacks subject-matter jurisdiction to engage in "judicial second-guessing" of Defendants' actions.  *Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467 U.S. at 814).

### 2. Plaintiffs' Claim Does Not Satisfy the Local-Law Requirement.

The Court also lacks subject-matter jurisdiction for an independent reason.  The FTCA waives sovereign immunity only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  To take subject-matter jurisdiction over an FTCA claim, the Court must "look to the law of the local jurisdiction . . . to determine whether there is a local private party analog[ue]" to the plaintiff's claim.  *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 508 (D.C. Cir. 2009).  Here, the Court looks to Iowa law to determine whether Plaintiffs could have stated a claim for relief in tort against Lundquist.  Because they could not, "sovereign immunity has not been waived," and the claim must be dismissed.  *Id.* at 510.

Plaintiffs' FTCA claim is premised on their allegation that Lundquist violated, or at least failed to adhere to, the FAA's Part 137 regulations.  *See* Compl. at 23.  But "[n]ot every violation by the government of its regulations will give rise to a claim under" the FTCA.  *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1091 (D.C. Cir. 1980).  Instead, FTCA plaintiffs are charged with identifying a tort claim on which they could prevail under local law and routing that claim through the FTCA.  The closest Plaintiffs come to making such a showing is a conclusory assertion that their Complaint "met the requirements at the state and local levels as there are statutes for negligen[ce], fraud, and discrimination at those levels."  Opp'n at 15.

But a passing reference to negligence is not enough. A plaintiff cannot rely on the "'general duty of one who undertakes an action to act with due care,' to state an actionable claim under the FTCA where the core of his claim is that the government failed to exercise due care in abiding by its own rules and regulations." *Lewis v. United States*, 83 F. Supp. 3d 198, 211 (D.D.C. 2015) (RC) (quoting *Hornbeck*, 569 F.3d at 509). Were the rule otherwise, every plaintiff could short-circuit the FTCA's local-law requirement by "merely re-label[ing] a violation of a federal" regulation as a general negligence claim. *Hornbeck*, 560 F.3d at 509.

And Plaintiffs' reference to "fraud" and "discrimination" is unavailing for a different reason. Those theories of liability sound in intentional torts, like misrepresentation or tortious interference with a business relationship. Such theories have some facial appeal here, where Plaintiffs appear to allege at times that Lundquist intentionally sabotaged their business. But the FTCA expressly preserves the United States's sovereign immunity against "[a]ny claim arising out of . . . misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). As a result, Plaintiffs have failed to identify an applicable tort analogue under Iowa law.

But because Plaintiffs are proceeding *pro se*, the Court looks beyond their briefing to determine for itself whether a local-law analogue exists. *E.g.*, *Lewis*, 83 F. Supp. 3d at 210. Specifically, the Court considers whether Lundquist's alleged failure to adhere to FAA regulations could constitute negligence *per se* or negligent infliction of emotional distress under Iowa law.

Iowa recognizes the common-law tort of negligence *per se*. *Wiersgalla v. Garrett*, 486 N.W.2d 290, 292 (Iowa 1992). Under that theory, a plaintiff may rely on a statute or regulation as proof of the applicable standard of care. *See id.* If a defendant proximately causes the plaintiff some harm by violating the relevant regulation, that defendant may be liable in negligence *per se*. *Id.* But critically, liability attaches only when the violated regulation "purposed or intended to

13

protect a class of persons to which the victim belongs against a particular harm which the victim has suffered." *Wilson v. Nepstad*, 282 N.W.2d 664, 667 (Iowa 1979).

That final requirement precludes any application of negligence *per se* here. Plaintiffs allege that Lundquist failed to follow the FAA's Part 137 regulations. Those regulations ensure that only qualified aviators with suitable equipment undertake the hazardous task of operating low-flying sprayer planes while distributing chemical agents. *See generally* 14 C.F.R. § 137. In other words, they protect the public from dangerous accidents. Although Plaintiffs are members of the public, they are not victims of a dangerous accident. The harms they assert are principally economic and competitive: As a result of Lundquist's negligence, they claim they lost out on Pettis Ag's revenues. Because those are not the types of harms the FAA's regulations are meant to prevent, Plaintiffs have no claim for negligence *per se* under Iowa law.

Nor could Plaintiffs recover under Iowa law on a claim for negligent infliction of emotional distress (NIED). Although such a theory of recovery finds no support in the Complaint, Plaintiffs refer to the distress allegedly caused by Lundquist's actions repeatedly in their Opposition. *E.g.*, Opp'n at 9 (describing harms to Plaintiffs' "mental and physical health . . . due to stress related issues"). But even if Plaintiffs had alleged an NIED claim, that claim would fail under Iowa law.

As a general matter, Iowa's courts "have refused to recognize an independent claim for emotional distress based on negligence." *Clark v. Estate of Rice*, 653 N.W.2d 166, 170 (Iowa 2002). Damages for emotional distress are recoverable as "parasitic damages" when "derived from [a] personal injury." *Id.* But because Plaintiffs have alleged no personal injury here, they must rely on an exception to Iowa's default rule against NIED claims.

Iowa has departed from its refusal to recognize NIED claims "only under two theories of recovery." *Clark*, 653 N.W.2d at 170. Neither exception applies here. First, plaintiffs may recover

14

in NIED under a theory of "bystander liability" when they personally "witness conduct that causes serious harm to a close relative." *Id.* Here, Plaintiffs allege nothing of the sort. Second, plaintiffs may recover in NIED when the duty the defendant breached arose from "a relationship that is contractual in nature and deals with services or acts the involve deep emotional responses." *Id.* at 171. Here, Plaintiffs do not allege any contractual relationship with Lundquist or the FAA. And even if they did, aircraft licensure is not a service giving rise to a uniquely emotional duty of care. *Contra Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990) (medical treatment of premature fetus); *Meyer v. Nottger*, 241 N.W.2d 911, 920 (Iowa 1976) (provision of funeral services).

Because Plaintiffs do not and cannot identify a local-law analogue for their FTCA claim, Defendants enjoy sovereign immunity against it. As a result, even if Plaintiffs' claim did not implicate a discretionary function, the Court would still lack subject-matter jurisdiction.

### B. Plaintiffs' FTCA Claim Is Untimely.

Even if the Court could take subject-matter jurisdiction over Plaintiffs' FTCA claim, that claim is time-barred. The FTCA's statute of limitations provides that a "tort claim against the United States shall be forever barred" unless the plaintiff presents her claim to the relevant agency "within two years after such claim accrues" and then files suit "within six months after" the agency denies his claim. 28 U.S.C. § 2401. That statute of limitations is not jurisdictional and is subject to equitable tolling. *United States v. Wong*, 575 U.S. 402, 405 (2015). But Plaintiffs did not present their claim in time. And they are not entitled to equitable tolling. So they cannot state a claim to relief. *See Montes v. Janitorial Partners, Inc.*, 859 F.3d 1079, 1084 (D.C. Cir. 2017).

***Timeliness.*** Plaintiffs presented their claim to the FAA on July 25, 2021. *See* Compl. at 6–12. Under the FTCA's two-year statute of limitations, then, this presentment was timely only if Plaintiffs' claim accrued sometime after July 25, 2019. *See* 28 U.S.C. § 2401. It did not.

15

An FTCA claim accrues when a plaintiff "has discovered both his injury and its cause." *United States v. Kubrik*, 444 U.S. 111, 120 (1979). Plaintiffs' claimed injuries are lost profits from the 2016 and 2017 spraying seasons due to Lundquist's amendment of the Pettis Ag Part 137 certificate and subsequent failure to stop Dathan Pettis from operating under that certificate. *See* Compl. at 28–29. To the extent the Complaint leaves any confusion about Plaintiffs' claimed injury, their Opposition dispels it by providing a summary of Defendants' "Challenged Acts," all of which occurred either in 2016 or 2017. Opp'n at 10–13. And Plaintiffs of course knew that they were not receiving the relevant Pettis Ag revenues in 2016 and 2017 because they were actively fighting for control of Pettis Ag in Iowa court at that time. *See* Compl. at 29.

Nor is there any doubt that Plaintiffs discovered the FAA was the cause of their alleged injuries before July 2019. Plaintiffs allege that they began lodging complaints with the FAA in "the Fall of 2016." Compl. at 28. And they allege that they continued to do so in March 2017. *Id.*

In their Opposition, Plaintiffs suggest that they did not discover their claim until May 13, 2021, when they received a letter from the FAA's Office of Audit and Evaluation explaining Lundquist's actions in 2016 and 2017. *See* Opp'n at 18; Compl. at 63–64. But that letter makes clear that Plaintiffs were already well aware of their grievances against the FAA because it discusses earlier interactions between Plaintiffs and the FAA on the subject. *See* Compl. at 63. In fact, Plaintiffs concede in their Opposition that they "went to the federal government" to complain about Lundquist—and thus had discovered their claim—in "May of 2018." Opp'n at 17.

Even taking Plaintiffs at their word, Plaintiffs' claim accrued at the very latest in May 2018. But they did not present their claim to the FAA until more than three years later in July 2021. Because Plaintiffs were required by statute to present that claim in just two years, their claim is more than a year out of time.

16

*Equitable Tolling.* Plaintiffs' untimely presentment to the FAA cannot be cured by equitable tolling. To show that equitable tolling is warranted, a plaintiff must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Plaintiffs bear the burden of establishing those preconditions. *Menominee Indian Tribe of Wisc. v. United States*, 577 U.S. 250, 256 (2016). But they have not carried that burden here.

Plaintiffs offer two justifications for their delay. First, they contend that they were both suffering from health problems that made it difficult to present their claim. *See* Opp'n at 17–18. Although the Court is sympathetic, this justification is hard to square with Plaintiffs' other allegations. Plaintiffs assert that their health problems began in 2017. *Id.* But they also assert that they "filed a complaint" with the FAA's Flight Standards Office in "May of 2018." *Id.* at 17. Whatever difficulties Plaintiffs were facing, they were—by their own admission—not inhibited from pursuing relief from the FAA. Evidently, Plaintiffs made a mistake by lodging an informal complaint rather than formally presenting their claim. That mistake is understandable. But it is also the type of "garden variety . . . excusable neglect" that does not warrant equitable tolling in this Circuit. *Norman v. United States*, 467 F.3d 773, 775 (D.C. Cir. 2006) (citation omitted).

Second, Plaintiffs suggest that the Covid-19 pandemic was an extraordinary circumstance that prevented timely presentment. Opp'n at 18. But the pandemic did not begin until March 2020. So, even counting from the latest plausible accrual date in May 2018, twenty-two months had run on Plaintiffs' twenty-four-month presentment period before Covid-19 began impacting government services. Plaintiffs offer no other explanation for their inaction in 2018 and 2019.

Because Plaintiffs are not entitled to equitable tolling, their FTCA claim is untimely. For that reason, they cannot state a claim, and their Complaint must be dismissed.

**C. Venue Does Not Lie in This District.**

Next, even if the Court had subject-matter jurisdiction, and even if Plaintiffs had stated a timely FTCA claim, the Court still could not hear that claim because Plaintiffs filed it in the wrong district. An FTCA claim "may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Plaintiffs reside in Missouri. Compl. at 1. And all the acts and omissions complained of occurred in Atlantic, Iowa and in the FAA's Des Moines, Iowa field office. As a result, neither of the FTCA's venue provisions permits suit in this District.

In their Opposition, Plaintiffs argue venue is proper for two reasons. First, they assert that they filed this suit "based on th[e] findings" in the 2021 letter they received from the FAA's Office of Audit and Evaluation, which is based in Washington, D.C. Opp'n at 23. But that is precisely the problem. The "findings of the violations," *id.*, in that letter are all about events that occurred in Iowa, *see* Compl. at 63–64. (And to be clear, the letter found that there were no violations. *Id.*)

Second, Plaintiffs argue that venue is proper in this District on what amounts to a theory of equitable estoppel. Plaintiffs assert (for the first time in their Opposition) that they "had two formal meetings" with the FAA's ethics counsel in D.C. regarding Lundquist's actions. Opp'n at 23. That lawyer allegedly said "see you in front of a Judge," "so [Plaintiffs] filed in Washington, D.C." *Id.* Even read with all the liberality due to *pro se* litigants, and even assuming some form of equitable estoppel could override the dictates of the FTCA's venue provisions, this argument fails. An invitation to file suit is not an invitation to file suit in the wrong District.

This Court is the wrong venue for Plaintiffs' Complaint. Because dismissal is warranted for all the other reasons stated, the Court need not assess whether dismissal or transfer is the proper remedy for this defect.

**D. Plaintiffs Fail to State a Claim for Sex Discrimination.**

Because Plaintiffs' FTCA claim fails for all the reasons stated, Plaintiffs' only path to relief is pleading a viable non-FTCA claim. Plaintiffs' civil cover sheet lists the FTCA as the only basis for their suit. Compl. at 3–4. But at times, Plaintiffs gesture at some form of stand-alone claim for intentional sex discrimination. Nonetheless, they have failed to state such a claim.

The Complaint's allegations on this subject are threadbare. Plaintiffs cite 5 U.S.C. § 2302(b) and assert that Lundquist "failed/neglected to stay neutral in his job responsibility" and "allowed other divisions and counterparts to discriminate in the actions as well." Compl. at 23. Later, Plaintiffs assert that a 2017 email between Lundquist and a supervisor "show[s] gender discrimination." *Id.* at 29. In that email, Lundquist's supervisor wrote: "I agree, whatever we can do to assist Dathan in keeping his operation up and running is good! I think he got the short end of the stick but that's my opinion." *Id.* at 62. Plaintiffs allege nothing further.

Plaintiffs' first problem is that they have not identified a viable cause of action. The statute they cite addresses prohibited personnel actions in the federal civil service. *See* 5 U.S.C. § 2302(b). But Plaintiffs have not alleged that they were FAA employees. And even if they did, their claim would likely be preempted. *Hardy v. Hamburg*, 69 F. Supp. 3d 1, 15–16 (D.D.C. 2014) (RBW).

Even treating the Complaint with the liberality due to *pro se* litigants, the Court cannot identify a workable alternative cause of action. Plaintiffs cannot assert a Title VII claim because, even if the FAA was their employer, they have not exhausted EEOC remedies. *Washington v. Wash. Metro. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998). And Plaintiffs cannot rely on 42 U.S.C. § 1981 because that statute does not "encompass types of discrimination other than those based on race." *Allen-Brown v. District of Columbia*, 54 F. Supp. 3d 35, 43 (D.D.C. 2014) (ABJ); *see also Runyon v. McCrary*, 427 U.S. 160, 167 (1976).

Further, even if Plaintiffs could identify a cause of action, they cannot state a claim. The Complaint's allegations are entirely conclusory, cannot be credited for that reason, and do not give rise to a plausible inference of intentional sex discrimination. *See Iqbal*, 556 U.S. at 681.

In their Opposition, Plaintiffs copy and paste an article titled "Gender Discrimination 101" that describes examples of workplace discrimination. Opp'n at 20–22. But this summary does not allege facts supporting an inference that Defendants engaged in sex discrimination.

Later, Plaintiffs assert that Lundquist's 2017 email reveals that he showed favoritism to Dathan Pettis. *See* Opp'n at 22. And they describe how Pettis Ag operated without issue "for 30+ years" until Plaintiffs—"2 women"—"became owners." *Id.* at 23. "Nothing changed EXCEPT the death of our parents leaving the ownership" of Pettis Ag to "[t]wo women now in a 'good ole boys' club." *Id.* at 4. But, again, to the extent these stray assertions amount to an allegation of sex discrimination, that allegation is conclusory. Plaintiffs offer no factual allegations that would support an inference of invidious discriminatory motive.

And there is "an obvious alternative explanation" for Lundquist's and the FAA's actions. *Twombly*, 550 U.S. at 567; *Iqbal*, 556 U.S. at 682. The exhibits that form the bulk of Plaintiffs' Complaint show that the FAA did not know who owned Pettis Ag, Compl. at 50, attempted to avoid having to answer that question itself by encouraging both Plaintiffs and Dathan Pettis to apply for new Part 137 Certificates, *id.*, and adopted the position that no further action should be taken until the Iowa courts resolved the Pettis family's probate dispute, *id.* at 50, 64.

It may be the case, as Plaintiffs allege and argue vigorously, that the FAA and Lundquist were negligent in taking this tack. But the facts as presented by Plaintiffs do not support a plausible inference that the FAA intentionally discriminated against them on the basis of sex, even at this early stage of litigation. Accordingly, Plaintiffs fail to state a stand-alone discrimination claim.

**IV. CONCLUSION**

Plaintiffs brought this suit under the Federal Tort Claims Act. But the Court lacks subject-matter jurisdiction over Plaintiffs' FTCA claim. That claim is also untimely. And venue over that claim does not lie in this district. Because no amendments could cure this litany of defects, the Court will **GRANT** Defendants' [14] Motion to Dismiss and **DISMISS** this matter **WITH PREJUDICE**. *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015).

For similar reasons, the Court will also **DENY** Plaintiffs' two [16] [21] motions requesting that the Court appoint pro bono counsel. There is no constitutional right to appointment of counsel in a civil case. *Brown v. Children's Nat'l Med. Ctr.*, 773 F. Supp. 2d 125, 140 (D.D.C. 2011) (PLF). Instead, the Court has discretion to appoint counsel to represent indigent *pro se* litigants under 28 U.S.C. § 1915. In exercising that discretion, the Court considers, among other things, the nature and complexity of the action, the potential merits of the *pro se* litigant's claims, and the interests of justice. LCvR 83.11(b)(3). Because the legal issues in this case are not complex, and because Plaintiffs' FTCA claim lacks merit, the interests of justice would not be served by diverting the limited resources of the *pro bono* panel to this case.

An appropriate order accompanies this Memorandum Opinion.

**DATED:** March 31, 2025.

COLLEEN KOLLAR-KOTELLY
United States District Judge

21